**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**CHRISTOPHER CHANOWITZ,**

                                    **Petitioner,**

              **v.**                                    **9:05-CV-120**
                                                         **(FJS/GHL)**

**DAVID MILLER, Superintendent of Eastern**
**Correctional Facility,**

                                    **Respondent.**
_____

**APPEARANCES**                          **OF COUNSEL**

**CHRISTOPHER CHANOWITZ**
**00-A-3078**
Woodbourne Correctional Facility
Riverside Drive
Woodbourne, New York 12788
Petitioner _pro se_

**OFFICE OF THE NEW YORK**               **ALYSON J. GILL, AAG**
**STATE ATTORNEY GENERAL**
120 Broadway
New York, New York 10271

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

## I. INTRODUCTION

        Petitioner Christopher Chanowitz is currently an inmate in the custody of the New York

State Department of Correctional Services ("DOCS") at Woodbourne Correctional Facility.  On

March 14, 2000, an Ulster County jury found him guilty of attempted murder in the second

degree, menacing in the second degree, and criminal possession of a weapon in the fourth degree.

_See_ Trial Transcript ("Tr.") at 817-18.  He was sentenced to a fifteen-year prison term.  _See_

Sentencing Transcript ("Sentencing Tr.") at 33-35.  Petitioner now seeks a writ of *habeas corpus*

pursuant to 28 U.S.C. § 2254 on the grounds that (1) his *Miranda*[1] rights were violated, (2) the

trial court violated his due process rights, (3) the evidence was insufficient to support his

conviction for attempted murder, (4) trial counsel was ineffective, and (5) appellate counsel was

ineffective.


## II. BACKGROUND

### A.     Events of September 13, 1998

> On the evening of September 13, 1998, [Petitioner]
> informed his spouse (hereinafter the victim) that he had a surprise
> for her in the garage of their marital residence.  [Petitioner] then
> twice blindfolded the victim and escorted her to the garage, but on
> both occasions informed her that the "surprise" was not yet ready.
> Unbeknown to the victim, [Petitioner] had rigged a pulley to the
> roof of the garage through which he had threaded a rope with a
> noose.  On the third trip to the garage, [Petitioner] lowered the
> noose over the victim's head,[2] at which point the victim removed
> the blindfold and noose and observed [Petitioner], who was
> wearing work gloves, clutching the other end of the rope.

*People v. Chanowitz*, 298 A.D.2d 767, 767 (3d Dep't 2002).

The victim noticed that the garage windows were blocked with plywood and a black

garbage bag.  *See* Tr. at 322.  The victim asked Petitioner what was happening.  He replied that

he was going to "take her out" because he had "bad things to tell her."  *See id.* at 323.  Petitioner

told the victim that, after he "took her out," he planned "to take himself out also."  *See id.* at 324.

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] Petitioner testified that he never placed the rope over the victim's head.  *See* Tr. at 557.
The victim testified that she felt something "heavy and round" come down over her neck that felt
like a rope and that she quickly reacted and "just hit it off me."  *See id.* at 318-19.

-2-

Petitioner then informed the victim that he had been involved with another woman, Kathy, for six years and that they had a child named Megan. *See id.* at 323-24. He told the victim that he wanted to live as a family with Kathy, Megan and Taylor, the daughter of Petitioner and the victim. *See id.* at 324-25.

> The victim returned to the residence and called her sister, Kelly Longinott. Upon arriving at the victim's residence and learning of the evening's events, Longinott immediately dialed 911, as a result of which Deputy Sheriffs Adrian Dispenza and Craig Meisel soon arrived at the scene. Once there, the Deputies followed Longinott into the house and separated the victim and [Petitioner] . . . .

*Chanowitz*, 298 A.D.2d at 767.

Deputy Sheriff Dispenza took Petitioner into the kitchen and closed the door. *See* Tr. at 197-98, 212. Petitioner was very agitated. *See id.* at 198. Deputy Sheriff Dispenza asked Petitioner what had happened. Petitioner responded that he had done a terrible thing. Deputy Sheriff Dispenza then asked Petitioner what he had done. Petitioner told him that he "tried to commit a double suicide" by luring his wife into the garage and putting a rope arounder her neck and that he then planned to kill himself with a gun. *See id.* at 198-201, 551. Petitioner also told Deputy Sheriff Dispenza where the gun, the rope, and the blindfold were. *See id.* at 201-02, 205. The gun was not loaded, and Deputy Sheriff Dispenza did not find any ammunition around the gun or on Petitioner's person. *See id.* at 202-03.

Deputy Sheriff Dispenza did not give Petitioner *Miranda* warnings during their conversation in the kitchen. *See* Tr. at 213, 548. At trial, Petitioner testified that he tried to get up on more than one occasion but was told to remain seated. *See id.* at 547. He also stated that he was never told in the kitchen that he was in police custody or that he was being detained. *See*

*id.* at 547-548.  He testified that Deputy Sheriff Dispenza never pulled a gun on him or handcuffed him to the chair.  *See id.* at 553.  However, he testified that Deputy Sheriff Dispenza blocked him when he stood up and that he considered that a threat.  *See id.* at 553.

Finally, Deputy Sheriff Dispenza collected the gun, the rope, and the blindfold and turned them over to Deputy Sheriff Meisel.  *See id.* at 205.  Deputy Sheriff Meisel placed Petitioner under arrest.  *See* Appellant's Appendix ("AA") at 41.


**B.      County Court proceedings**

On February 5, 1999, the Ulster County grand jury issued an indictment charging Petitioner with attempted murder in the second degree, menacing in the second degree, and criminal possession of a weapon in the fourth degree.  *See* AA at 4-5.

Petitioner moved to suppress his statements to Deputy Sheriff Dispenza and the items seized from his home.  On November 29, 1999, the County Court held a suppression hearing.  On March 3, 2000, the County Court denied the suppression motion in a written decision.  *See id.* at 6-8.  The County Court found that Petitioner's statements to Deputy Sheriff Dispenza "were not the result of any police questioning and were not made while [Petitioner] was in custody."  *See id.* at 7-8.

The record reflects that Petitioner was present at the November 29, 1999 hearing.  *See* Suppression Hearing Transcript ("Suppression Hearing Tr.") at 1.  The parties discussed whether a *Ventimiglia* [3] hearing was necessary.  *See id.* at 8-10.  The County Court reserved decision on

---

[3] In New York criminal practice, a *Ventimiglia* hearing concerns the admissibility of evidence of prior conduct, other than direct proof of a defendant's prior crime, which tends to

(continued...)

that issue for "the time of trial."  *See id.* at 10.

On March 8, 2000, the County Court conducted a pre-*voir dire* conference.  The record reflects that Petitioner was present at that conference.  *See* Tr. at 1.  One reason for the conference was to conduct a *Ventimiglia* hearing regarding evidence of Petitioner's extramarital affairs to prove "intent, motive and to make a complete picture, a complete presentation of the relationship between [Petitioner] and the victim and the surrounding circumstances of what happened in this case."  *See id.* at 3-4.  The County Court reserved decision, stating that the decision "would depend upon the theory of the defense put forth . . . before the jury and the testimony as it develops during the trial.  [The Court's] inclination is not to sidetrack the trial with extramarital affairs.  However, if the defendant opens the door and [the extra marital affairs] become relative [sic] to motive or design under *Molineaux*,[4] [the Court] think[s] . . . [it] will have to conduct a *Molineaux* hearing."  *See id.* at 8-9.  At the conclusion of the pre-*voir dire* conference, the County Court asked counsel to "take your positions in the courtroom."  The record then states that "[t]he following proceedings were conducted in open court."  Those proceedings began with the court greeting the potential jurors before beginning *voir dire*.  *See id.* at 26-27.

---

[3](...continued)
implicate the defendant in the commission of the charged crime.  *See People v. Ventimiglia*, 52 N.Y.2d 350 (1981); *Jones v. Artuz*, No. 97-CV-2063, 2002 WL 31006171, *9 (E.D.N.Y. Aug. 30, 2002).  In *People v. Spotford*, 85 N.Y.2d 593, 596 (1995), the New York Court of Appeals held that a criminal defendant has a right, under New York law, to be present at a *Ventimiglia* hearing.

[4] *People v. Molineaux*, 168 N.Y. 264 (1901), deals with the prosecutor's use of a defendant's prior crimes to prove an element of the crime for which the defendant is currently on trial.

Trial commenced on March 9, 2000.  In his opening statement, the District Attorney stated that "in the course of their marriage [Petitioner] cheated, let's say 1989, some other times, and [the victim] insisted on working out the marriage, continuing the marriage."  *See* Tr. at 173. Defense counsel did not object.

Petitioner's trial theory was that he never intended to kill the victim.  Rather, he intended to scare her so much that she would hate him and grant him a divorce.  *See id.* at 708.  Defense counsel presented this theory beginning with his opening statement, in which he referred to Petitioner as the "pinnacle" of a love triangle that included the victim and Kathy.  *See id.* at 185. As part of this presentation, defense counsel informed the jurors that they would "hear stories of [Petitioner's] unfaithfulness to [the victim]."  *See id.* at 187.

The jurors did, indeed, hear such stories.  On direct examination of the victim, the District Attorney inquired about Petitioner's 1989 affair with a woman named Shannon.  *See id.* at 271-72.  Defense counsel did not object.  The District Attorney also asked the victim about Petitioner's relationship with Kathy.  *See id.* at 323-25.  Defendant counsel did not object.  In fact, defense counsel delved further into the topic by cross-examining the victim about Petitioner's affairs with Shannon, *see id.* at 350, and Kathy, *see id.* at 362-64.

Defense counsel explored the topic further when Petitioner took the stand in his own defense, questioning him about both affairs.  *See id.* at 501-502, 503, 507-508, 512, 529, 550. Defense counsel raised no objection to the introduction of evidence regarding Petitioner's infidelities until the prosecutor asked Petitioner on cross-examination whether he had had affairs with women other than Shannon and Kathy.  At that point, the court cut off questioning.  *See id.* at 569.  Later, when the prosecutor asked Petitioner whether he had contacted Shannon in the

mid-1990s "wanting to get back together with her," the court excused the jury for lunch.  *See id.* at 582-83.  Addressing counsel, the court stated that "we are getting into the area now of cross examination by way of certain alleged *Ventimiglia* misconduct, is that correct?"  *See id.* at 583. Defense counsel objected to the prosecutor's line of questioning regarding "involvement with Shannon while Kathy is giving birth while he is married to" the victim.  *See id.* at 584.  The court stated that the prosecutor was "getting into matters that are going to be confusing and misleading to the jury" and that any further questioning would be "a marginal area of credibility."  *See id.* at 585-86.  The prosecutor did not pursue the line of questioning regarding Shannon after the court's ruling, although he did question Petitioner further regarding his relationship with Kathy.  *See id.* at 591-93.  Defense counsel objected to the first of this line of questions – "What would you pinky swear with your daughter about?"[5] – but did not object to any of the questions that followed.

At the close of the evidence, defense counsel requested a jury charge on renunciation. Upon the prosecutor's consent, the court agreed to present a renunciation charge.  *See* Tr. at 666-70.

In closing, defense counsel argued that Petitioner never intended to kill the victim. Rather, he intended to tell her that their marriage was over in a way "so horrific that he could never be forgiven."  *See id.* at 701-02.  To the contrary, the prosecutor argued that Petitioner intended to kill the victim.  *See id.* at 711-744.

Regarding renunciation, the court instructed the jury as follows:

---

[5] Petitioner testified that Taylor, his daughter with the victim, would offer pinky swears not to tell anyone that she had gone to places such as the pool and the zoo with Petitioner, Kathy, and Megan.

As a first element the defendant must prove that his renunciation was voluntary and complete . . .

As a second element the defendant must prove that he by his own conduct made a substantial and successful effort to prevent the commission of the Attempted Murder in the Second Degree.[6]

For the defendant's efforts to be substantial they must be sincerely, conscientiously exerted and, most important, be of a convincing nature.  To be a successful effort, it must have been the sole and motivating consideration or reason for abandoning all further efforts and intention to commit the attempted murder.

Whether or not the defendant's effort[s] were voluntary and complete and whether or not he made a substantial and successful effort to prevent the commission of the crime, are both questions of fact for you, the jury, to decide.

In summary, in order to prove the defense of renunciation, the defendant is required to prove to your satisfaction by a preponderance of the credible evidence as I have defined that term to you both of the following two essential elements:

1.      That prior to the commission of any Attempted Murder in the Second Degree the defendant voluntarily and completely renounced all intention and purpose to continue with the commission of that crime as I have defined that term to you.

2.      That in addition to himself renouncing, he made a substantial effort to prevent the commission of the Murder in the Second Degree.[7]

If the defendant establishes both such essential elements to your satisfaction by a preponderance of the credible evidence, you must find him not guilty of the crime of Attempted Murder in the

---

[6] On readback, the court restated this as "the defendant must prove that he by his own conduct made a substantial and successful effort to prevent the commission of *the crime*."  *See* Tr. at 808 (emphasis added).

[7] On readback, the court rephrased this as "he made a substantial effort to prevent the commission of the *attempted murder*."  *See* Tr. at 809 (emphasis added).

Second Degree.

On the other hand, if he fails to establish one or both of such
essential elements, you may render a verdict of guilty of Attempted
Murder in the Second Degree.

*See* Tr. at 783-86.

The court also gave an extensive jury charge regarding *Miranda*.  *See* Tr. at 763-68.  In

addition, the court gave a *Ventimiglia* charge, advising the jury that it was to consider evidence of

Petitioner's extramarital affairs solely to judge his credibility and not for any other purpose.  *See*

*id.* at 762-63.  The prosecutor objected to the charge after it was read, stating that he wanted the

jury to consider the affairs as motive evidence.  The court overruled the prosecutor's objection.

*See id.* at 770-71.

During deliberations, the jury requested readbacks of, among other things, the definition

of attempted murder in the second degree, the definition of renunciation, and the portions of

Deputy Sheriff Dispenza's testimony about Petitioner's statements to her and whether she advised

Petitioner of his *Miranda* rights.  *See* AA at 43-46.

On March 14, 2000, the jury found Petitioner guilty of attempted murder in the second

degree, menacing in the second degree, and criminal possession of a weapon in the fourth degree.

*See* Tr. at 817-18; AA at 49.  On April 20, 2000, the court sentenced Petitioner to a determinate

term of fifteen years on the attempted murder charge with concurrent one-year terms for

menacing and weapon possession.  *See* Sentencing Tr. at 33, 34-35.


**C.**     **Direct appeal**

Petitioner appealed.  He argued that (1) his warrantless arrest violated his rights under

-9-

*Payton v. New York*;[8] (2) Deputy Sheriff Dispenza obtained his statements in violation of *Miranda*; (3) the trial court should have suppressed his statements and the items seized as a result of his statements; (4) the People elicited testimony not contained in the New York Criminal Procedure Law § 710.30 notice;[9] (5) the trial court erred by not holding the requested *Ventimiglia* hearing until after the People had introduced evidence of Petitioner's 1989 affair; (6) the evidence was insufficient to prove attempted murder; (7) the trial court's renunciation charge misstated the law; (8) trial counsel rendered ineffective assistance during the suppression hearing by failing to seek a *Ventimiglia* ruling or to object to evidence about the 1989 affair and by failing to object to the renunciation charge; (9) the trial court erred by allowing the prosecutor to argue that Petitioner "admitted" his wrongdoing to the victim's sister; (10) the prosecutor engaged in misconduct by alleging that Petitioner was a liar "since at least 1989;" and (11) the sentence was excessive.  *See* Appellant's Brief.

The Appellate Division affirmed the trial court.  In its opinion, the Appellate Division addressed Petitioner's arguments regarding *Payton v. New York*, the sufficiency of the evidence, and New York Criminal Procedure Law § 710.30 in some detail.  *See Chanowitz*, 298 A.D.2d at 767-69.  Regarding Petitioner's other arguments, the Appellate Division stated only that it had "considered defendant's remaining arguments . . . and f[oun]d them to be equally without merit." *Id.* at 769.

---

[8] In *Payton v. New York*, 445 U.S. 573 (1980), the Supreme Court held that, absent exigent circumstances or consent, the police must obtain a warrant before entering a suspect's home to make a routine felony arrest.  *See id.* at 589 (quotation omitted).

[9] Under New York Criminal Procedure Law § 710.30, the People must serve on the defendant a notice specifying any statements that the defendant made to a public servant that the People intend to introduce at trial.  *See* N.Y. Crim. Proc. Law § 710.30.

The New York Court of Appeals denied Petitioner leave to appeal on February 3, 2003.

*See People v. Chanowitz*, 99 N.Y.2d 613 (2003).


**D.      Petitioner's New York Criminal Procedure Law § 440.10 motion**

Petitioner, acting through counsel, filed a motion pursuant to New York Criminal

Procedure Law § 440.10 in Ulster County Court.  He argued that trial counsel had been

ineffective because he failed to communicate the prosecutor's plea offer to Petitioner.  In

opposition, the prosecutor submitted minutes of a March 5, 1999 court proceeding, which

showed that Petitioner personally rejected the plea offer.  On May 28, 2004, the County Court

denied Petitioner's motion.  The Appellate Division denied Petitioner's application for leave to

appeal on December 7, 2004.  *See* State Court Records of § 440.10 motion.


**E.      Petitioner's motion for writ of error *coram nobis***

Petitioner, proceeding *pro se*, filed a motion for writ of error *coram nobis* with the

Appellate Division on August 16, 2004.  He argued that his conviction should be set aside

because (1) he was not present at the *Ventimiglia* hearing; (2) his *Miranda* rights were violated;

and (3) appellate counsel was ineffective because he did not raise Petitioner's absence from the

*Ventimiglia* hearing or "meaningfully raise" the *Miranda* issue.  The Appellate Division denied

the motion in a two-sentence order[10] on October 14, 2004.  The Court of Appeals denied

---

[10] "Motion for writ of error coram nobis to vacate decision and order of this Court in
*People v. Chanowitz* (298 AD2d 767 [2002], *lv denied* 99 NY2d 613 [2003]).  Upon the papers
filed in support of the motion and the papers filed in opposition thereto, it is ORDERED that the
motion is denied."

Petitioner leave to appeal on December 7, 2004.

**F.      Proceedings in this Court**

Petitioner filed his original petition in this Court on January 31, 2005.  *See* Dkt. No. 1.

The Court directed Petitioner to file an amended petition, *see* Dkt. No. 4, which Petitioner did on

April 8, 2005, *see* Dkt. No. 5.  Respondent filed his response on October 21, 2005.  *See* Dkt. No.

16.  Petitioner filed a traverse on November 7, 2005.  *See* Dkt. No. 18.

## III. DISCUSSION

**A.      Standard of review**

When reviewing a *habeas* petition, a federal court is limited to deciding whether a

conviction violated the Constitution, laws or treaties of the United States.  *See* 28 U.S.C.

§ 2241(c).  Relief does not lie for errors of state law.  *See Estelle v. McGuire*, 502 U.S. 62, 67-68

(1991); *DiGuglielmo v. Smith*, 366 F.3d 130, 136-37 (2d Cir. 2004) (quotation omitted).  Under

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may not

grant *habeas* relief to a state prisoner on a claim that was adjudicated on the merits in state-court

proceedings unless the state court's decision was "contrary to, or involved an unreasonable

application of, clearly established federal law, as determined by the Supreme Court."  28 U.S.C.

§ 2254(d)(1); *Carey v. Musladin*, 127 S. Ct. 649, 653 (2006); *Campbell v. Burgess*, 367 F. Supp.

2d 376, 380 (W.D.N.Y. 2004) (citations omitted).

A state court adjudicates a claim "on the merits" when it finally resolves the claim, with

*res judicata* effect, based on substantive rather than procedural grounds.  *See Sellan v. Kuhlman*,

261 F.3d 303, 312 (2d Cir. 2001).  This is so "even if the state court does not explicitly refer to either the federal claim or to relevant federal case law."  *Id.*  To determine whether a state court has adjudicated a claim "on the merits," a federal *habeas* court must examine three "clues" to classify the state-court decision as either "(1) fairly appearing to rest primarily on federal law or to be interwoven with federal law or (2) fairly appearing to rest primarily on state procedural law."[11]  *Jimenez v. Walker*, 458 F.3d 130, 145 (2d Cir. 2006) (citation omitted).  "Absent a clear and express statement of reliance on a state procedural bar," decisions in the first category are deemed to have been made "on the merits" of the federal claim.  *Id.*

A decision "on the merits" is "contrary to . . . clearly established federal law" when it is "either contrary to Supreme Court precedent on a question of law or . . . opposite to a relevant Supreme Court case with 'materially indistinguishable' facts."  *Johnson v. West*, No. 9:04-CV-751, 2007 WL 952058, *2 (N.D.N.Y. Mar. 29, 2007) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)).  A state court unreasonably applies federal law when the state court correctly identifies the governing legal rule in a particular case but applies the rule to the facts in an "objectively unreasonable" manner.  *See id.* (quoting *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)).  Although "some increment of incorrectness beyond error is required," in order to grant a federal habeas application, that "increment need not be great; otherwise, habeas relief would be limited to state court decisions 'so far off the mark as to suggest judicial incompetence.'"  *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000) (quotation omitted); *see also Hawkins v. Costello*, 460 F.3d 238, 243 (2d Cir. 2006) (quotation omitted).  The state court's determination of a

---

[11] "[T]he three clues to the basis of a state court's decision are (1) the face of the state-court opinion, (2) whether the state court was aware of a procedural bar, and (3) the practice of state courts in similar circumstances." *Jimenez*, 458 F.3d at 145 n.16.

factual issue is presumed to be correct, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1); *DeBerry v. Portuondo*, 403 F.3d 57, 66 (2d Cir. 2005) (citation omitted); *Boyette v. Lefevre*, 246 F.3d 76, 88 (2d Cir. 2001) (quoting 28 U.S.C. § 2254(e)(1)).

The AEDPA standard applies in this case. Examining the three "clues" described in *Jimenez*, the state courts' decisions fairly appear to rest primarily on federal law or to be interwoven with federal law. The faces of the opinions do not indicate that any of the decisions rested on state procedural law. The only procedural bar that was asserted in the state-court proceedings was the District Attorney's argument on direct appeal that Petitioner's objection to the renunciation jury charge had not been preserved. The District Attorney argued in the alternative that, "in any event, the Court's charge correctly conveyed the applicable legal principles to the jury." The state appellate court's decision stated that it had considered defendant's arguments and found "them to be . . . without *merit*." *Chanowitz*, 298 A.D.2d at 769 (emphasis added). The state court thus did not explicitly rely on a procedural bar to reject Petitioner's argument regarding the jury charge.

Furthermore, in the state-court writ proceedings, the District Attorney did not argue that any of Petitioner's arguments were procedurally barred. Thus, the state court's decision in those proceedings did not rely on a procedural bar. *See Sellan*, 261 F.3d at 308, 312 (holding that order denying motion for writ of *coram nobis* with the statement "Upon the papers filed in support of the motion and the papers filed in opposition thereto, it is ORDERED that the motion is denied" was an adjudication "on the merits" where no procedural bar was argued or available).

Indeed, Respondent does not argue that any of Petitioner's claims are procedurally barred.

-14-

Thus, the AEDPA standard applies, and this Court must determine whether the state court's decisions were "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1); *see also Carey*, 127 S. Ct. at 653; *Campbell*, 367 F. Supp. 2d at 380.


**B.     Petitioner's *Miranda* rights**

Petitioner argues that his *Miranda* rights were violated.  *See* Dkt. No. 5-2 at 10-11. Petitioner raised this issue in the trial court, on direct appeal, and in the state court writ proceeding.  In its decision denying Petitioner's motion to suppress, the trial court found that Petitioner's statements to Deputy Sheriff Dispenza "were not the result of any police questioning and were not made while [Petitioner] was in custody."  *See* AA at 7-8.  The jury also apparently rejected Petitioner's *Miranda* argument.  The Appellate Division rejected Petitioner's *Miranda* argument on direct appeal as "without merit," *see Chanowitz*, 298 A.D.2d at 769, and in the writ proceeding without comment.

The Fifth Amendment to the United States Constitution provides, in pertinent part, that no person "shall be compelled in any criminal case to be a witness against himself[.]"  U.S. Constitution, amend V.  Under *Miranda*, a person questioned by law enforcement officers "after . . . [being] taken into custody or otherwise deprived of his freedom of action in any significant way" "must [first] be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  *Miranda*, 384 U.S. at 444; *see also Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).  In determining whether an individual is considered "in custody" for *Miranda*

-15-

purposes, courts must "consider whether a reasonable person would have believed he was at liberty to end the interrogation, taking into account the specific circumstances surrounding the subject questioning." *Campbell*, 440 F. Supp. 2d at 140 (citing *Thompson v. Keohane*, 516 U.S. at 111, 116 S. Ct. 457).  Those circumstances include whether a suspect is told that he is free to leave, *see Campaneria v. Reid*, 891 F.2d 1014, 1020 n.1 (2d Cir. 1989); whether the suspect is handcuffed, *see United States v. Newton*, 369 F.3d 659, 673-74 (2d Cir. 2004); the location and atmosphere of the interrogation, *see Mathiason*, 429 U.S. at 494-95; the language and tone that the police use, *see United States v. Guarno*, 819 F.2d 28, 31-32 (2d Cir. 1987) (quotation omitted); and the length of the interrogation, *see Yarborough v. Alvarado*, 541 U.S. 652, 664-65 (2004); *Berkemer v. McCarty*, 468 U.S. 420, 437-38 (1984) (citation and footnote omitted). However, the ultimate inquiry for custody determinations is whether a reasonable person in the suspect's position would have felt that he was free to terminate the interrogation and leave. *See California v. Beheler*, 463 U.S. 1121, 1125 (1983); *Yarborough*, 541 U.S. at 662.

Petitioner argues (1) that he was actually "in custody" because Deputy Sheriff Dispenza separated him from the other people in the house and closed the door to the kitchen and (2) that he was constructively "in custody" because Ulster County has an administrative policy requiring police investigating domestic disputes to "interview all persons." *See* Dkt. No. 5-2 at 10-11.

It was reasonable for the state courts to conclude that Petitioner was not, factually, "in custody" because the surrounding circumstances do not indicate that Petitioner was in custody. Petitioner testified at trial that Deputy Sheriff Dispenza never told him that he was in police custody or that he was being detained. *See* Trial Tr. at 547-48.  Deputy Sheriff Dispenza did not handcuff him. *See id.* at 553.  Moreover, the incident took place in Petitioner's home, which

-16-

strongly indicates that he was not in custody.  *See United States v. Mitchell*, 966 F.2d 92, 99 (2d Cir. 1992) (holding that the defendant was not in custody because, among other things, he was "in the familiar surroundings" of his home (citing *Beckwith*, 425 U.S. at 342, 347, 96 S. Ct. at 1616; *United States v. Rakowski*, 714 F. Supp. 1324, 1334 (D. Vt. 1987) ("Lower courts . . . almost universally hold that questioning in a suspect's home is not custodial because individuals in a familiar environment are less likely to be intimidated by law enforcement officers.") (collecting cases)).  *But cf. Orozco v. Texas*, 394 U.S. 324, 327 (1969); *United States v. Jones*, 630 F.2d 613, 615 (8th Cir. 1980) (holding that "[t]he place where an interrogation takes place does not conclusively establish the presence or absence of custody.  A deprivation of freedom may take place at one's home as well as at the police station." (citation omitted)).  Although Petitioner testified that Deputy Sheriff Dispenza blocked him when he stood up and that he took that as a threat, *see* Trial Tr. at 553, it was not unreasonable to discredit that testimony and conclude that a reasonable person in Petitioner's position would have felt that he was free to terminate the interrogation and leave.

Ulster County's policy of interviewing all persons when responding to a domestic violence call is simply irrelevant because there is no evidence that Petitioner was aware of that policy at the time that Deputy Sheriff Dispenza questioned him.  Thus, the policy would not have had any effect on a "reasonable person in the suspect's position."  Even if Petitioner had been aware of the policy, the policy does not require officers to "take all persons into custody."  Rather, it requires officers merely to "interview all persons."  Thus, it would not be unreasonable to conclude that a reasonable person with knowledge of the policy would feel free to terminate the interrogation and leave.

-17-

Accordingly, for all these reasons, the Court concludes that the state courts did not unreasonably apply clearly established federal law by finding that Petitioner's *Miranda* rights were not violated.

**C.      Due Process**

Petitioner argues that the trial court's "untimely" *Ventimiglia* decision and the renunciation jury charge violated his due process rights.

### 1. Ventimiglia

Petitioner argues that the trial court's "untimely" *Ventimiglia* charge violated his right to due process and that the trial court should not have admitted evidence of his infidelities.  *See* Dkt. No. 5-2 at 25-26.  The state court rejected this argument without discussion on direct appeal. *See Chanowitz*, 298 A.D.2d at 769.

> The right to a *Ventimiglia* hearing does not derive from the Federal constitution and is solely a matter of State law. . . . In general, errors of State law are not cognizable on habeas review. . . . Nevertheless, due process requires the State courts, in conducting criminal trials, to proceed consistently with "that fundamental fairness" which is "essential to the very concept of justice." . . . "The introduction of improper evidence against a defendant does not amount to a violation of due process unless the evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice.' . . ."

*Holmes v. Ricks*, 378 F. Supp. 2d 171, 181-82 (W.D.N.Y. 2004) (internal quotations and citations omitted).

In the Second Circuit, "evidence of prior crimes, wrongs, or acts is admissible for any purpose other than to show a defendant's criminal propensity[,]" *United States v. Harris*, 733

F.2d 994, 1006 (2d Cir. 1984), as long as it is "relevant to some disputed issue in the trial" and satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence, *United States v. Figueroa*, 618 F.2d 934, 939 (2d Cir. 1980) (citations omitted).  "Other acts" evidence may also be admitted to complete the story of the crimes charged.  In *Harris*, for example, the trial court admitted evidence of the defendant's prior narcotics dealings with a witness to inform the jury of the background to the charged conspiracy and to show the basis for the defendant's trust of the witness.  *See Harris*, 733 F.2d at 1006-07; *see also United States v. Brennan*, 798 F.2d 581, 589-90 (2d Cir. 1986)*; United States v. Moten*, 564 F.2d 620, 628 (2d Cir. 1977); *United States v. Torres*, 519 F.2d 723, 727 (2d Cir. 1975).

Here the evidence helped to "complete the story."  The evidence helped explain both the prosecution's theory that Petitioner intended to murder his wife so that he could be with Kathy and the defense theory that Petitioner merely wanted to scare his wife so much that she would give him a divorce so that he could be with Kathy.  Thus, the Court finds that the introduction of the evidence of Petitioner's infidelities did not violate fundamental conceptions of justice and, therefore, Petitioner's *Ventimiglia* argument is not cognizable on *habeas* review.

### 2. Renunciation jury charge

Petitioner argues that the trial court's renunciation jury charge violated his due process rights.  *See* Dkt. No. 5-2 at 26.  The state court rejected this argument on direct appeal.  *See Chanowitz*, 298 A.D.2d at 769.

"A jury charge in a state trial is normally a matter of state law and is not reviewable on federal habeas corpus absent a showing that the alleged errors were so serious as to deprive

-19-

defendant of a federal constitutional right." *United States ex rel. Smith v. Montanye*, 505 F.2d

1355, 1359 (2d Cir. 1974) (citations omitted); *see also* 28 U.S.C. § 2254.   "'Before a federal court

may overturn a conviction resulting from a state trial in which . . . [a particular] instruction was

used, it must be established not merely that the instruction is undesirable, erroneous, or even

'universally condemned,' but that it violated some right which was guaranteed to the defendant by

the Fourteenth Amendment.'"   *Montanye*, 505 F.2d at 1359 (quoting *Cupp v. Naughten*, 414 U.S.

at 146, 94 S. Ct. at 400).   "The question is whether 'the ailing instruction by itself so infected the

entire trial that the resulting conviction violates due process.'"   *Grey v. Henderson*, 788 F. Supp.

683, 693 (E.D.N.Y. 1991) (quoting *Cupp*, 414 U.S. at 147, 94 S. Ct. at 400).

     In the present case, as Respondent correctly notes,

> [u]nder N.Y. Penal Law § 40.10(3), it is an affirmative defense to
> an attempt crime that, "under circumstances manifesting a
> voluntary and complete renunciation of his criminal purpose, the
> defendant avoided the commission of the crime attempted by
> abandoning his criminal effort and, if mere abandonment was
> insufficient to accomplish such avoidance, by taking further and
> affirmative steps which prevented the commission thereof."   When
> the court's [sic] instructed the jury on this defense, it read this
> statute verbatim (T. 781-782), and then explained the defense's two
> elements: that petitioner must proved [sic] that his renunciation
> was "voluntary and complete;" and that he must prove that "he by
> his own conduct made a substantial and successful effort to prevent
> the commission of the Attempted Murder in the Second Degree"
> (T. 783-785).   Thereafter, the court once referenced that the effort
> must have been to prevent the commission of "attempted murder"
> (T. 784), and once stated that the effort must have been to prevent
> "commission of the Murder in the Second Degree" (T. 785).

*See* Dkt. No. 16 at 34-35.

     Although the second element of the trial court's renunciation charge may have confused

the jury, as demonstrated by the fact that the jury requested a readback, its use did not "'so

infect[] the entire trial that the resulting conviction violates due process.'" *Grey*, 788 F. Supp. at 693 (quotation omitted).  Furthermore, any confusion regarding the second element could not have had any effect because no rational trier of fact could have found that Petitioner satisfied the first element.  Under New York law, in order for a renunciation to be "voluntary and complete," it must result from a defendant's "change of heart" uninfluenced by "a belief that circumstances exist that increase the probability of detection or apprehension or make more difficult the completion of the crime."  *People v. Taylor*, 80 N.Y.2d 1, 13 (1992) (citation omitted).  None of the evidence adduced at trial indicated such a change of heart.  Therefore, the Court concludes that the state court's rejection of Petitioner's claim was not an unreasonable application of clearly established federal law.

**D.      Sufficiency of the evidence**

Petitioner argues that the evidence was insufficient to support his conviction for attempted murder because he had not taken a "substantial step" toward murdering the victim.  He argues that only if he had "cinched the noose, pulled the rope, and the beam or rope snapped" would he be guilty of attempted murder.  *See* Dkt. No. 5-2 at 21-24.  The state court rejected this argument on direct appeal.  *Chanowitz*, 298 A.D.2d at 769.

The Court notes that "weight of the evidence" review of a conviction is a product of New York state statute and, therefore, merely a state-law issue.  *See* N.Y. Crim. Proc. Law § 470.15; *Van Stuyvesant v. Conway*, No. 03 Civ. 3856, 2007 WL 2584775, *21 n.20 (S.D.N.Y. Sept. 7, 2007) (citation omitted); *Graham v. Ricks*, No. 9:02-CV-0303, 2004 WL 768579, *14 (N.D.N.Y. Apr. 7, 2004) (citations omitted).  Since federal *habeas corpus* review is not available to remedy

mere errors of state law, *see Estelle*, 502 U.S. at 67-69, a *habeas* claim challenging the weight of

the evidence adduced at trial does not present a cognizable federal issue. *See Graham*, 2004 WL

768579, at *14 (citations omitted); *Feliz v. Conway*, 378 F. Supp. 2d 425, 430 n.3 (S.D.N.Y.

2005) (citations omitted); *Bradley v. Johnson*, No. 99-CV-86, 2005 WL 1577171, *4 (W.D.N.Y.

July 1, 2005) (citations omitted); *Comacho v. McKinney*, No. 04 Civ. 2226, 2004 WL 1490308,

*1 (S.D.N.Y. July 1, 2004) (holding that "petitioner's first ground . . . arguing only that the

verdict was against the weight of the evidence . . . raises no claim cognizable in a federal habeas

corpus proceeding"); *Brown v. Fischer*, No. 03 Civ. 9818, 2004 WL 1171277, *6 (S.D.N.Y. May

27, 2004) (noting that "[i]t is well-settled that a weight of the evidence claim is not cognizable on

federal habeas review" (citations omitted)).  Thus, to the extent that Petitioner's request for

*habeas* relief is premised on a challenge to the weight of the evidence, the Court denies the

claim.

A challenge to the sufficiency of the evidence, however, is amenable to federal *habeas*

review.  *See Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (citing *Quirama v. Michele*,

983 F.2d 12, 14 (2d Cir. 1993)); *Norris v. Fischer*, No. 06 CV 2190, 2007 WL 1452127, *7

(E.D.N.Y. May 15, 2007).  In the challenged criminal matter, the state appellate court stated that

> [w]e . . . reject [Petitioner's] contention that the People failed to
> establish an attempted crime inasmuch as the proof only
> demonstrated preparation for the crime and not an overt act in
> furtherance thereof.  There can be no doubt that in distinguishing
> preparatory acts from punishable attempts, a line must be drawn
> between those acts that are remote and those that are proximate to
> the crime.  Here, rigging the rope, covering the garage windows
> and, indeed, blindfolding the victim and leading her to the garage
> all were acts preparatory to committing the actual crime.  However,
> once [Petitioner] slipped the noose over the victim's head and
> around her neck and grabbed the other end of the rope with his

-22-

> gloved hands, he committed acts that were proximate to the commission of the crime of murder and, but for the victim's quick response, the jury could and obviously did conclude that [Petitioner] would have carried out his purpose.

*Chanowitz*, 298 A.D.2d at 768.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution protects a defendant in a criminal case against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime(s) with which he is charged. *See Fiore v. White*, 531 U.S. 225, 228-29 (2001); *Jackson v. Virginia*, 443 U.S. 307, 315 (1979) (citation omitted); *In re Winship*, 397 U.S. 358, 364 (1970). This inquiry "does not focus on whether the trier of fact made the *correct* guilt or innocence determination, but rather whether it made a *rational* decision to convict or acquit." *Herrera v. Collins*, 506 U.S. 390, 402 (1993). A *habeas* petitioner claiming that there was insufficient evidence supporting his conviction is entitled to relief under 28 U.S.C. § 2254 only if it is found "that upon the record evidence adduced at trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324 (footnote omitted); *see also Schlup v. Delo*, 513 U.S. 298, 323 n.38 (1995). The reviewing court is required to consider the evidence in the light most favorable to the prosecution and draw all inferences in its favor. *See Jackson*, 443 U.S. at 319. The relevant inquiry in this regard is "whether the evidence adduced at trial could support any rational determination of guilty beyond a reasonable doubt." *United States v. Powell*, 469 U.S. 57, 67 (1984) (citing *Jackson v. Virginia*, 443 U.S. 307, 316, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979)) (other citations omitted).

"When considering the sufficiency of the evidence of a state conviction, '[a] federal court

must look to state law to determine the elements of the crime.'" *Ponnapula*, 297 F.3d at 179

(quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999)); *see also Fama v. Comm'r*

*of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000) (citation omitted); *Flowers v. Fisher*, No. 03

CV 5405, 2006 WL 3050876, *8 (E.D.N.Y. Oct. 23, 2006) (citation omitted); *Hill v. Miller*, No.

03-CV-1738, 2005 WL 807044, *2 (E.D.N.Y. Apr. 8, 2005) (citation omitted).  Therefore, this

Court must consider the elements that the prosecutor was required to prove beyond a reasonable

doubt to convict Petitioner.

 In New York, a person may be found guilty of an attempt to commit a crime when, "with

intent to commit a crime, he engages in conduct which tends to effect the commission of such

crime."  N.Y. Penal Law § 110.00 (McKinney 2004).  The New York Court of Appeals has

recognized that in order to distinguish a punishable attempt from mere preparation to commit a

crime, a "'line must be drawn between those acts which are remote and those [acts which] are

proximate and near to the consummation'" of the crime.  *People v. Acosta*, 80 N.Y.2d 665, 670

(1993) (quotation omitted).  To be punishable as an attempt, the defendant's acts must be "very

near" or "dangerously near" the commission of the crime.  *Id.*; *People v. Kassebaum*, 95 N.Y.2d

611, 618 (2001).

 A rational person reviewing the record evidence adduced at Petitioner's trial could have

found that Petitioner came "dangerously near" murdering the victim.  The jury heard evidence

that Petitioner blocked the garage windows with plywood and a black garbage bag, that he led the

victim blindfolded to the garage, that the victim then felt something "heavy and round" come

down over her neck that felt like a rope, and that the victim "hit the rope and blindfold off" and

saw Petitioner, wearing work gloves, clutching the other end of the rope.  Although Petitioner

testified that he never put the rope around the victim's neck, a rational trier of fact could have disregarded that testimony in favor of the victim's.  Therefore, the Court concludes that the state courts did not unreasonably apply clearly established federal law when they rejected Petitioner's claim regarding this issue.


E.      **Trial counsel**

Petitioner argues that trial counsel was ineffective because he did not press for a *Ventimiglia* ruling, challenge the legality of the police officers' entry into Petitioner's home, or object to the trial court's renunciation jury charge.  *See* Dkt. No. 5-2 at 12-20.  The state court rejected this argument on direct appeal.  *See Chanowitz*, 298 A.D.2d at 769.

The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend VI.  To establish a violation of this right to the effective assistance of counsel, a *habeas* petitioner must show both (1) that counsel's representation fell below an objective standard of reasonableness, measured in light of prevailing professional norms; and (2) resulting prejudice, that is, a reasonable probability that, but for counsel's unprofessional performance, the outcome of the proceeding would have been different.  *See Strickland v. Washington*, 446 U.S. 674, 688-90 (1984); *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (holding that "the legal principles that govern claims of ineffective assistance of counsel" were established in *Strickland*).[12]  There is a strong presumption that counsel's conduct fell within the wide range

---

[12] In *Williams v. Taylor*, 529 U.S. 362, 391 (2000), the Supreme Court declared that "the rule set forth in *Strickland* qualifies as 'clearly established Federal law[.]'"

of reasonable assistance and that counsel's actions constituted sound trial strategy under the

circumstances.  *See Cuevas v. Henderson*, 801 F.2d 586, 589-90 (2d Cir. 1986).

     Trial counsel's conduct regarding the *Ventimiglia* issue appears to have constituted sound

trial strategy under the circumstances.  As discussed above, defense counsel's theory of the case

was that Petitioner intended merely to frighten the victim into divorcing him.  This was a

workable theory and, if successful, could have resulted in Petitioner being acquitted of attempted

murder and convicted only of menacing in the second degree and criminal possession of a

weapon in the fourth degree.  Menacing in the second degree and criminal possession of a

weapon in the fourth degree are both class A misdemeanors under New York law, with a

maximum sentence of one year.  *See* N.Y. Penal Law § 70.15, 120.14, 265.01 (McKinney 2006).

The sentences for these two lesser crimes would have been substantially shorter than any possible

sentence for attempted murder, which, under New York Penal Law § 70.02, carries a sentence of

five to twenty-five years.  Evidence of Petitioner's affair with Kathy was necessary to support this

defense theory.  Thus, pressing for a *Ventimiglia* ruling that excluded such evidence would not

have been in Petitioner's best interest.

     Moreover, it was reasonable for the state courts to conclude that trial counsel's failure to

challenge the police entry into Petitioner's home or the renunciation jury charge was not

ineffective assistance.  Nothing in the record indicates that these failures prejudiced Petitioner.

The bulk of the evidence against Petitioner came through the victim's testimony, which was not

obtained as a direct result of the entry into the home.  In addition, as discussed above, any

ambiguity in the second element of the renunciation jury charge was offset by the total lack of

evidence supporting the first element.  Therefore, the Court concludes that the state courts did

-26-

not unreasonably apply clearly established federal law in rejecting Petitioner's claim regarding this issue.

**F.      Appellate counsel**

Petitioner argues that appellate counsel was ineffective because he did not argue that Petitioner's absence during the *Ventimiglia* hearing violated Petitioner's rights or that Petitioner was "interrogated" within the meaning of *Miranda*.  *See* Dkt. No. 5-2 at 3-9.  The Appellate Division denied these claims when Petitioner raised them in his motion for writ of error *coram nobis*.

The *Strickland* standard for determining the effectiveness of trial counsel also applies to claims of ineffective assistance of appellate counsel.  *See, e.g., Holmes v. Bartlett*, 810 F. Supp. 550, 560-61 (S.D.N.Y. 1993) (quotation omitted).  Clearly established federal law holds that appellate counsel does not have a duty to raise every colorable claim on appeal and, in fact, can use his professional judgment to determine which claims represent the best opportunities for obtaining a reversal of a conviction.  *See Jones v. Barnes*, 463 U.S. 745, 751-53 (1983).

The record reflects that Petitioner was present when the *Ventimiglia* issue was discussed at the suppression hearing and at the pre-*voir dire* conference.  *See* Suppression Hearing Tr. at 1; Trial Tr. at 1.  Petitioner argues that the fact that the record reflects that the trial court asked counsel to "take your positions in the courtroom" at the close of the pre-*voir dire* hearing indicates that the hearing took place in the judge's chambers.  *See* Dkt. No. 5-2 at 1-2, 5-6. Nothing in the record supports that theory.  It is more likely that counsel had approached the bench for oral argument and that the court was directing them back to their counsel tables.  Given

-27-

the state of the record, appellate counsel's "failure" to assert the argument on appeal did not fall below an objective standard of reasonableness and did not prejudice Petitioner.  Rather, it represented a valid exercise of professional judgment.

Furthermore, the record shows that appellate counsel effectively raised the *Miranda* issue. Counsel argued that Petitioner was in custody, both factually and constructively, when Deputy Sheriff Dispenza questioned him.  Petitioner asserts that counsel should also have argued that Petitioner was "interrogated" within the meaning of *Miranda*.  *See* Dkt. No. 5-2 at 3-9.  The state courts' determination that Petitioner was not "in custody" shows that any such "failure" on the part of appellate counsel did not prejudice Petitioner.  Even if appellate counsel had argued and succeeded in proving that Petitioner was "interrogated," the courts' reasonable determination that Petitioner was not "in custody" would have precluded a finding that Petitioner's *Miranda* rights were violated.  Therefore, the Court concludes that the Appellate Division's decision was not an unreasonable application of clearly established federal law.


### IV. CONCLUSION

Accordingly, after reviewing the entire file in this matter, the parties' submissions, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that the petition for a writ of *habeas corpus* is **DENIED and DISMISSED**; and the Court further

**ORDERS** that, because Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), no certificate of appealability will issue with respect to any of Petitioner's claims.

**IT IS SO ORDERED.**

Dated: June 2, 2008
        Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Court Judge